**Electronically Filed
Intermediate Court of Appeals
CAAP-13-0003065
17-OCT-2014
09:30 AM**

NO. CAAP-13-0003065

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

KILAKILA 'O HALEAKALĀ,
Appellant-Appellant,
v.
BOARD OF LAND AND NATURAL RESOURCES;
DEPARTMENT OF LAND AND NATURAL RESOURCES;
WILLIAM AILA, JR., in his official capacity as
Chairperson of the Board of Land and Natural Resources;
and UNIVERSITY OF HAWAI'I,
Appellees-Appellees

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 12-1-3070)

MEMORANDUM OPINION
(By: Foley, Presiding J., Reifurth, J. and Circuit Court
Judge Nakasone in place of Nakamura, C.J., Fujise, Leonard
and Ginoza, JJ. all recused)

This secondary agency appeal arose from Appellee-Appellee University of Hawaii's (**University**)[1] March 10, 2010 Conservation District Use Application (**CDUA**) to build the Advanced Technology Solar Telescope (**Solar Telescope**) at the summit of Haleakalā on the island of Maui. On May 24, 2010, Appellant-Appellant Kilakila 'O Haleakalā (**Kilakila**)[2] petitioned the Board of Land and Natural Resources (**Board**) for a contested case hearing for the CDUA. The request was resubmitted on July 8, 2010 and December 2, 2010. On December 1, 2010, the Board

_____

[1]     More specifically, the University Institute for Astronomy submitted the CDUA.

[2]     Kilakila is an organization "dedicated to the protection of the sacredness of the summit of Haleakalā."

approved the University's CDUA, issuing Permit MA-3542.  See Kilakila ʻO Haleakalā v. Bd. of Land & Natural Res., 131 Hawaiʻi 193, 196-97, 317 P.3d 27, 30-31 (2013) (**Kilakila 1**).  Shortly thereafter, Kilakila challenged Permit MA-3542 in circuit court under Hawaii Revised Statutes (**HRS**) § 91-14 (2012 Repl.).  See id.

On February 11, 2011, while the circuit court appeal of Permit MA-3542 was pending, the Board approved Kilakila's request for a contested case hearing on Permit MA-3542.  See Kilakila 1, 131 Hawaiʻi at 198, 317 P.3d at 32.  As a result, the circuit court dismissed the appeal as moot.  See id.  The Hawaiʻi Supreme Court held the circuit court had jurisdiction to review Kilakila's challenge under HRS § 91-14 because the Board effectively denied Kilakila's request for a contested case hearing when it approved Permit MA-3542 without rendering a decision on Kilakila's request.  See id., 131 Hawaiʻi at 203, 317 P.3d at 37.  On December 13, 2013, the supreme court remanded the case to the circuit court to decide Kilakila's request for a stay or reversal of the Board's 2010 Approval.  See Kilakila 1, 131 Hawaiʻi at 206, 317 P.3d at 40.

Meanwhile, on November 9, 2012, following the contested case hearing for CDU Permit MA-3542, the Board again approved the University's permit application, issuing Conservation District Use Permit MA-11-04.  Kilakila's challenge of CDU Permit MA-11-04 is now before this court.

Kilakila appeals from the "Final Judgment" entered August 20, 2013, and the "Order Affirming the Board of Land and Natural Resources' Findings of Fact, Conclusions of Law, Decision and Order in DLNR File No. MA-11-04" entered July 11, 2013, both entered in the Circuit Court of the First Circuit[3] (**circuit court**).

On appeal, Kilakila contends the circuit court erred when it affirmed the Board's approval of MA-11-04 because:

---

[3]     The Honorable Rhonda A. Nishimura presiding.

(1) the Board's approval did not comply with Hawaii Administrative Rules (**HAR**) § 13-5-30(c) (1994);

(2) the Board erred by considering economic factors;

(3) the Board erred by weighing the lack of alternatives against the Solar Telescope's adverse impacts,

(4) the correct entity did not apply for the conservation district use permit (**CDUP**),

(5) the Solar Telescope is inconsistent with the June 8, 2010 Management Plan (**Management Plan**) prepared by the University of Hawai'i Institute for Astronomy (**UIA**),

(7) the Board violated Kilakila's procedural due process rights; and

(8) the Board acted pursuant to unauthorized procedure.

## I.  BACKGROUND

In 1961, the State of Hawai'i (**State**) transferred approximately eighteen acres of land on Haleakalā to the University on the condition the land be set aside for the Haleakalā High Altitude Observatory Site (**Observatory Site**). The Observatory Site, located within a conservation district, is in a subzone which specifically permits astronomy facilities. See HAR §§ 13-5-24(c) (1994) and 13-5-25(a) (1994). The UIA proposed to build the Solar Telescope at the Observatory Site. The Solar Telescope is funded by the National Science Foundation (**NSF**). Along with the CDUA, the University submitted a copy of the Solar Telescope's Final Environmental Impact Statement (**FEIS**)[4] prepared by the NSF, and a Management Plan.[5] The CDUA was initially approved on December 1, 2010 and the Board issued Conservation

---

[4]     The FEIS assesses the impacts the Solar Telescope would have at the Preferred Mees and alternative Reber Circle sites as well as the impact on the Observatory Site if the Solar Telescope were not built ("No Build" alternative). The FEIS assesses the impacts of the Solar Telescope individually and in combination with existing facilities at the site ("cumulative impacts").

[5]     The Management Plan is a prerequisite for building astronomy facilities at the Observatory Site. See HAR 13-5-25(c)(4) and 13-5-24 (astronomy facilities may be constructed in a conservation district general subzone only if the project receives approval of a board permit and management plan). The Management Plan "includes policies and practices for the long-term preservation of archeological and cultural resources within the [Observatory Site]."

District Use (**CDU**) Permit MA-3542. Without staying CDU Permit MA-3542, the Board granted Kilakila's request for a contested hearing on CDU Permit MA-3542. The Board appointed Steven Jacobson (**Jacobson**) as the hearing officer.

On June 2, 2011, Kilakila filed a motion to disqualify Deputy Attorney General Linda Chow (**Chow**) from advising Jacobson or the Board at the hearing. Kilakila contended Chow could not serve as Counsel for the Tribunal without casting suspicion on the hearing's integrity because Chow previously represented the Board in a related circuit court proceeding involving Kilakila.[6]

On June 28, 2011, Jacobson denied the motion to disqualify Chow without prejudice to Kilakila moving the Board to disqualify Chow after Jacobson filed and served his report to the Board. This denial provided that (1) disqualification of Chow was within the hearing officer's discretion under HAR § 13-1-32(c) (2009),[7] (2) Kilakila's objection to Chow may be untimely and possibly waived, and (3) the motion to disqualify was without merit because "unlike the lay members of the Board of Education in [White v. Bd. of Educ., 54 Haw. 10, 501 P.2d 358 (1972)]" Jacobson had more professional experience and would prepare his own findings of fact (**FOFs**), conclusions of law (**COLs**), and recommendation based on his own evaluation and the parties' submissions. The contested case hearing on the merits was held on July 18-20 and August 26, 2011. Chow acted as Counsel for the Tribunal.

On March 2, 2012, Kilakila filed a post-hearing motion to disqualify Chow from advising Jacobson and the Board regarding the Hearing. Kilakila reiterated the arguments it made in its prior motion to disqualify. On March 16, 2012, the Board denied the motion on the ground that Chow's appearance as counsel for

---

[6]     Chow represented the Board in a related case, Civ. No. 10-1-2510, contending the Solar Telescope was consistent with HRS Chapter 205 and HRS Chapter 183C, as a specifically allowed use in the resource subzone of the conservation district.

[7]     HAR § 13-1-32(c) provides in relevant part that during a contested case hearing, the hearing officer has the power to "dispose of other matters that normally and properly arise in the course of a hearing authorized by law that are necessary for the orderly and just conduct of a hearing."

the Board in Civ. No. 10-1-2510 did not disqualify her from advising the Board.

On March 19, 2012, the Board filed Minute Order No. 14, which provided that the Board had become aware of a March 15, 2012 email from Jacobson to counsel for the University. In that email, Jacobson stated he had been subjected to inappropriate *ex parte* pressure and activity by U.S. Senator Daniel Inouye's **(Senator Inouye)** and the Governor's offices to quickly render a recommendation, which resulted in him initially submitting an incomplete report and recommendation to the Board. The email further provided:

> The seeming consensus of the appropriate ethical offices with which I have now consulted is that no disclosures are required as long as (1) neither [UIA] nor its counsel had anything to do with what the Senator's and Governor's offices were doing, (2) the Board and courts disregard the interim report and recommendations and consider only the final report and recommendations (to the extent they consider them at all), and (3) Kilakila is not prejudiced by being shortchanged in time to respond to the final report and recommendations.
>
> So, my question for you is whether any of you had anything to do with what the Senator's and Governor's offices were doing.

The Board found Jacobson's email itself was an impermissible *ex parte* communication under HAR § 13-1-39 (2009).

Jacobson filed a response to Minute Order No. 14 on March 20, 2012. Jacobson's response provided:

#### Preparation of My Reports and Recommendations

> In this file, while preparing my report and recommended decision, considerable *ex parte* pressure was placed upon me to simply spit out a recommended decision quickly, so that the Board would have something before it, to approve. That pressure included requiring me to make daily reports to both the Health Department and the Board's Chair as to how soon I contemplated finishing, what else I thought I needed to do, why I thought I had to do it, etc.
>
> The pressure included a "suggestion" that [Chow] be given a role in completing the decision.
>
> I was advised that the pressure was generated by a staffer in [Senator Inouye's] office, and applied through the Governor's office. I was not asked to recommend a particular result, although the result Senator Inouye's office wanted from the Board was clear. I did not see any evidence that anyone else (*i.e.*, anyone in State Government), wanted any

5

particular result, and the Board's Chair, in particular, made clear that all he wanted to know was when this matter could be put on the Board's calendar.

My initial report and recommended decision herein were filed as a result of "or else" pressure. The only way the pressure affected my initial report and recommended decision was that they were incomplete. I made no substantive changes in light of comments by [Chow].

I then completed my final report and recommendations. In completing them, the only effect of the previous pressure upon me (which had been withdrawn). was that I very carefully went through everything [UIA] submitted, again, to be sure that I hadn't missed something that those favoring the [Solar Telescope] might be hoping that I would miss.

Again, nothing substantive was changed due to anything said by [Chow]. The final report and recommendations are entirely mine.

While preparing the final report and recommendations, I did find, online, a Final Supplemental Environmental Assessment (FESA) for the [Solar Telescope], published February 10, 2012, which no one had bothered to disclose to me. I took the FESA into account.

My initial report and recommendations had not included any suggested conditions to granting of the CDUA. In light of the FESA, and other factors, the final report included four recommended conditions.

### After My Reports and Recommendations Were Filed

Once my final report and recommendations were filed, I checked back with counsel because of my concerns (i) that no one be prejudiced by the unusual filing of an initial report before my final report (i.e., that my initial report and recommendations be ignored, and that [Kilakila] have sufficient opportunity and time to respond and make objections to the final report), and (ii) that full disclosure might be required in any event.

Included among those issues was whether the *ex parte* pressures placed upon me were "communications bearing upon the substance of a matter" as that term is used in HRCJC Rule 2.9(b).

Although the Board's counsel opined that no disclosures were required, assuming that [UIA's] counsel had nothing to do with the pressures generated, that was less than helpful advice as there was no basis for simply assuming that [UIA's] counsel were not involved.

The better conclusion, in my view after further consultations, was (and is) that full disclosure was (and is) required unless (i) it is clear that [UIA's] counsel were not involved, (ii) my initial report and recommendations are ignored, and (iii) Kilakila has

sufficient opportunity and time to respond and make objections to the final report and recommendations.

### The Conflicting Rules re Determining Whether [UIA's] Counsel Were Involved

The Board's counsel's opinion, and the conclusion that full disclosure was required unless [UIA's] counsel were not involved, raised the questions of (i) how to determine whether any of [UIA's] counsel were involved (ii) without making the very disclosures that might not have been required.

Here several conflicting rules were involved, which HAR § 13-1-39, an administrative rule (not a statute), must be interpreted in light of:

1. HRCJC Rule 2.2 & Comment I thereto, which required me "To ensure impartiality and fairness to all parties."

2. HRCJC Rule 2.9(a)(5), which allows initiating, permitting, or considering an ex parte communication when expressly authorized by law.

3. HRCJC's Terminology section, defining "Law" as including statutes, rules, ordinances, constitutional provisions, provisions of the HRCJC, and decisional law.

4. The common law of necessity, which is part of decisional law. See HRS § 1.1 ("The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage").

After considering all of the applicable rules, principles, and advice of others, my conclusion was that, in these highly unusual circumstances, the law allowed me to simply ask [UIA's] counsel if they were involved in any way with the pressures placed upon me. If they said "yes," then full disclosure would be required. If they said "no," then the next step would have been to further consult with counsel as to what to do with that "no" – whether to report it as part of a full disclosure, or something else.

At the same time, I would have been continuing to monitor the proceedings before the Board, to be sure that my initial decision was not considered, and that Kilakila was not being shortchanged on time to respond to my final report and recommendations.

As things turned out, [UIA] itself chose full disclosure, and response times have been suspended, so those concerns have been mooted.

The University responded to Minute Order No. 14 by urging the Board to review the record and issue a decision itself, without appointing a new hearing officer. The University

requested in the alternative that a new hearing officer be required to issue a decision within a reasonable time frame and limit additional fact finding to a site visit. Kilakila responded in turn by requesting appointment of a new hearing officer and disclosure "of any communications tending to show that external political pressure was applied to affect the outcome of this proceeding[.]"

On March 29, 2012, the Board filed Minute Order No. 15 concluding:

> Even assuming the communications from the non-parties were initiated at the urging of a party in this case, such communications would be considered permitted ex parte communications under [HAR] § 13-1-37(b)(2) which permits requests for information with respect to the procedural status of a proceeding.
>
> The communication from the Hearing Officer to [UIA] was an unpermitted ex parte communication in violation of [HAR] § 13-1-37.
>
> Despite the assertions by the Hearing Officer that the pressure that was put on him to issue a decision did not influence the outcome of his decision, the Board finds that the totality of the circumstances gives rise to a question regarding the impartiality of the Hearing Officer in arriving at his recommended decision.

Consequently, "to avoid even the appearance of impropriety," the Board discharged Jacobson and struck from the record Jacobson's proposed FOFs, COLs, and decision and order.

On March 30, 2012, Kilakila filed a "Motion of [Kilakila] for Disclosure of All Communications To and From [the Board] Regarding the [Solar Telescope]," in which they sought, in part, information about a March 21, 2012 meeting regarding the Solar Telescope.

On June 4, 2012, the Board issued Minute Order No. 23, providing:

> The Motion is granted with regard to the meeting held on March 21, 2012, as referenced in Exhibit A of the Reply. The following disclosures are made regarding that meeting:
>
> a. A meeting occurred on March 21, 2012, at which Chairperson Aila was in attendance. No party to the contested case was present during the meeting.
>
> b. During the meeting the sole topic of discussion was when the recommended decision in this contested case would be issued by the hearing officer, Steven Jacobson.

c. There was no discussion of any substantive issues involved in this contested case hearing.

Inasmuch as no party was present during the meeting, there was no ex parte communication with the hearing officer or any member of the Board. Even if a party were present, the discussion referred to above comes within the purview of [HAR] § 13-1-37 [(2009)] as a permitted communication related to requests for information with respect to the procedural status of a proceeding. No further action is required regarding this communication.

The Board is the head of the Department of Land and Natural Resources (DLNR). [HRS] § 26-15 [(2009 Repl.)]. As the head of the DLNR, the Board has many functions. Its members function in a quasi-legislative capacity when engaged in rule making, as adjudicators when deciding a contested case, and as trustees and managers when considering dispositions of public lands.

When carrying out their duties as Board members, the members of the Board interact with numerous people in various situations. Kilakila's Motion does not provide a time frame or context for the requested disclosures and the motion may encompass communications that occurred long before this matter was the subject of a contested case.

Kilakila's Motion also relies heavily on statements made by the former hearing officer regarding inquiries made and pressure put upon the hearing officer to render a decision. As this Board has already determined, the communication to the hearing officer came within HAR § 13-1-37 as a permitted ex parte communication. When the hearing officer went beyond communication allowed under HAR §13-1-37, the Board acted appropriately by disclosing the ex parte communication and discharging the hearing officer. Minute Order No. 15.

Kilakila's Motion fails to show that any communications beyond those allowed under HAR § 13-1-37, and the previously disclosed communications between the former hearing officer and others, have occurred. Kilakila's Motion is based, at most, upon mere speculation. Kilakila's Motion has also not shown that the Board has acted in any manner other than as an impartial adjudicator in this case. In addition, any prejudice that may have occurred as a result of communications with the former hearing officer has been remedied by the Board's discharge and replacement of the hearing officer. The Board is mindful that no matters outside the record should be considered when making its decision, except as allowed under HRS chapter 91.

For the reasons stated above, Kilakila's Motion with regard to disclosure of all other communications, other than what is disclosed above, is hereby denied.

(Emphasis added.)

On May 2, 2012, the Board appointed Lane Ishida (**Ishida**) as hearing officer. Also on May 2, 2012, the Board filed Amended Minute Order No. 19, in which it modified CDU Permit MA-11-04 to prohibit construction during the pendency of the contested case proceeding except for the removal of Reber Circle[8] and other unused facilities at the Observatory Site.

On June 12, 2012, Kilakila filed a motion to reconsider Minute Order No. 23. Kilakila contended that the "sole topic" of the March 21, 2012 meeting[9] could not have been "when the recommended decision in [the Solar Telescope] contested case would be issued by the hearing officer, Steven Jacobson[,]" because Jacobson had already issued his initial and final decisions.

On July 13, 2012, the Board granted the motion in part and denied it in part, amending Minute Order No. 23 to read, "During the meeting, the sole topic of discussion was when the final decision in this contested case would be issued, in light of Minute Order No. 14, filed on March 19, 2012."

On July 16, 2012, Ishida filed a Report and Proposed Findings of Fact and Conclusions of Law, Decision and Order (**Proposed Order**). On August 13, 2012, Kilakila filed its exceptions to the Proposed Order. Among other things, Kilakila argued that UIA was not authorized to apply for the CDUP.

On September 27, 2012, Kilakila filed a second motion to reconsider Minute Order No. 23. Attached to the motion were emails that purportedly revealed (1) the University/UIA acted in bad faith, (2) that "immense political pressure has been applied in this case that is even greater than prior documents had revealed[,]" and (3) that Aila had received more *ex parte* communication than had been previously revealed. These emails,

---

[8]  Reber Circle is the remnant of a former radio telescope facility at the Observatory Site. Removal of Reber Circle was proposed as a mitigation measure.

[9]  Chairperson William Aila, Jr. (**Aila**), Attorney General David Louie, Bruce Coppa, a representative from the Governor's office, and Jennifer Sabas (**Sabas**), staff member for Senator Inouye, appear to have attended, or at the least, planned to attend the meeting.

between (1) Mike Mayberry, a UIA representative, and Sabas, and between (2) Sabas and Aila, appear to indicate communication about the possibility of losing funding for the Solar Telescope if construction did not begin by a certain date.

On November 9, 2012, the Board issued an order denying the second motion to reconsider Minute Order No. 23. The Board found Kilakila failed to demonstrate any impermissible *ex parte* communication occurred between Jacobson or any Board members and a party in the case.

On November 9, 2012, the Board granted the CDUA in its Findings of Fact, Conclusions of Law, Decision, and Order (**Order Granting CDUP**). The Board concluded the Solar Telescope satisfied the criteria set forth in HAR § 13-5-30(c) (1994). The Solar Telescope's CDUA was granted subject to 20 conditions.

On December 6, 2012, Kilakila appealed to the circuit court from the Order Granting CDUP under HRS § 91-14 and other authorities. Kilakila primarily asked the circuit court to stay and reverse the Order Granting CDUP. On July 11, 2013, the circuit court affirmed the Board's Order Granting CDUP, and on August 20, 2013, the court entered its "Final Judgment" in favor of the University.

## II.  STANDARDS OF REVIEW

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which [the appellate] court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) (1993) to the agency's decision.

HRS § 91-14, entitled "Judicial review of contested cases," provides in relevant part:

(g)  Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1)  In violation of constitutional or statutory provisions; or

(2)  In excess of the statutory authority or jurisdiction of the agency; or

(3)  Made upon unlawful procedure; or

(4)     Affected by other error of law; or

(5)     Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6)     Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Under HRS § 91-14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).

United Pub. Workers, AFSCME, Local 646, AFL-CIO, v. Hanneman, 106 Hawai'i 359, 363, 105 P.3d 236, 240 (2005) (brackets in original omitted) (quoting Paul's Elec. Serv., Inc. v. Befitel, 104 Hawai'i 412, 416, 91 P.3d 494, 498 (2004)).   "Pursuant to HRS § 91-14(g), an agency's conclusions of law are reviewed de novo." United Pub. Workers, 106 Hawai'i at 363, 105 P.3d at 240 (internal quotation marks and citation omitted).   "A circuit court's conclusions of law are subject to de novo review." Paul's Elec. Serv., 104 Hawai'i at 420, 91 P.3d at 502.

### III.   DISCUSSION

### A.   The Board's approval of the Solar Telescope complies with HAR § 13-5-30(c).

#### 1.   HAR §§ 13-5-30(c)(1) & (2)

Kilakila contends the Solar Telescope is inconsistent with the purpose of the conservation district and objectives of the general subzone.   HAR § 13-5-30(c)(1) and (2) provide that the proposed land use must be "consistent with the purpose of the conservation district" and "the objectives of the subzone of the land on which the use will occur[.]"   The Solar Telescope's proposed sites are located in the General subzone.   "The objective of this subzone is to designate open space where specific conservation uses may not be defined, but where urban use would be premature."   HAR § 13-5-14 (1994).   HAR § 13, Chapter 5 does not define "urban use," but

Under the Land Use Law, lands are designated as belonging in one of four land use districts:   urban, rural, agricultural, and conservation. . . . Land in an urban district tolerates the highest degree of development and conservation land the least.

Life of the Land v. Land Use Comm'n of State of Hawaii, 63 Haw. 166, 170 n.3, 623 P.2d 431, 437 n.3 (1981).

In the Order Granting CDUP, COL 28, the Board concluded:

> a. HAR § 13-5-30(c)(1). The proposed land use is consistent with the purpose of the conservation district because the [Solar Telescope] is an allowed use within the conservation district and it is located within the [Observatory Site] which already includes other astronomical facilities. The use of an already developed area promotes protection, preservation and long-term sustainability of the surrounding areas within the conservation district.

> b. HAR § 13-5-30(c)(2). The [Solar Telescope] is not an urban use and is consistent with the uses allowed under Executive Order No. 1987. The proposed land use is a specific permitted use in the general subzone. The [Observatory Site] is developed with roads, parking lots and astronomy facilities. The proposed [Solar Telescope] will occupy one of the last two developable sites at the [Observatory Site], and thus should have a negligible effect on open space at Haleakalā and is consistent with the objectives of the general subzone.

The circuit court found:

> 3.    Of the five subzones listed in HAR § 13-5-10, the [Solar Telescope] is located in the General Subzone. "The objective of this subzone is to designate open space where specific conservation uses may not be defined, but where urban use would be premature." HAR § 13-5-14. [The Board] found that the [Solar Telescope] is not an urban use and is consistent with the objectives of the General Subzone, particularly because the site is currently developed with roads, parking lots, and other astronomy facilities. The [circuit court] agrees.

Kilakila contends the Solar Telescope is an "urban use" due to its height, mass, scale, use of hazardous materials, location in an area known as "Science City," which is already 40% developed, industrial appearance, and substantial impacts. Much of Kilakila's argument on this point concerns whether the Solar Telescope has a substantial impact on natural resources and is addressed below in section III, A, 3.

HAR § 13-5-25 expressly allows astronomy facilities to be built in the resource subzone. See HAR § 13-5-24, -25. There is no limitation in the rule regarding the size, appearance, or other characteristics a facility may have, as long as the construction and operation of the facility otherwise complies with HAR Chapter 13, Section 5. See id.

13

## 2. HAR § 13-5-30(c)(3)

HAR § 13-5-30 provides that the proposed land use must comply with "provisions and guidelines contained in [HRS Chapter] 205A, entitled 'Coastal Zone Management [(**CZM**)],' where applicable[.]" HAR § 13-5-30(c)(3). "All agencies shall enforce the objectives and policies of this chapter . . . ." HRS § 205A-5(b) (2011 Repl.). Two such objectives are to protect, preserve, and where desirable, (1) "restore those natural and man-made historic and prehistoric resources in the coastal zone management area that are significant in Hawaiian and American history and culture[,]" and (2) "restore or improve the quality of coastal scenic and open space resources." HRS §§ 205A-2(b)(2)(A) and 205A-2(b)(3)(A) (2011 Repl.). Kilakila contends the Solar Telescope is inconsistent with HRS § 205A-2(b) because it adversely affects the visual and cultural resources of the summit of Haleakalā, including the Observatory Site, which "is a natural prehistoric resource that is significant in Hawaiian history and culture." In COL 28(c), the Board concluded:

> The goals of the [CZM] program are to address issues from an integrated ecosystem perspective, and as no lands in Hawai'i are more than 30 miles from the shore the entire State is considered to be in the Coastal Zone. The objectives and policies of the [CZM] program relate to recreational resources, historic resources, scenic and open space resources, coastal ecosystems, economic uses, coastal hazards, managing development, public participation, beach protection and marine resources. HRS § 205A-2. The implementation of mitigation measures . . . is designed to reduce, minimize, eliminate, or compensate for the impacts of the [Solar Telescope] on surrounding areas. In particular, impacts of storm water runoff and effects on groundwater, which may directly affect the coastal zone, will be reduced to a negligible level. The [Solar Telescope] is consistent with the goals and objectives of HRS chapter 205A.

(Emphasis added.) Additionally, as discussed further below in section III, A, 3, the Board found the Solar Telescope's visual impact would not be significant and the site's cultural resources would be reasonably protected. Consequently, Kilakila's contention is without merit. See generally Application of Hawaiian Elec. Co., Inc., 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996) (courts refrain from determining whether the weight of evidence supports an administrative finding).

### 3. HAR § 13-5-30(c)(4)

Kilakila contends the circuit court erred because the substantial evidence does not support the conclusion that the Solar Telescope would not have a substantial adverse impact to existing natural resources. HAR § 13-5-30(c)(4) provides that

> (c) In evaluating the merits of a proposed land use, the department or board shall apply the following criteria:
>
> . . . .
>
> (4)  The proposed land use will not cause substantial adverse impact to existing natural resources within the surrounding area, community, or region[.]"

Natural resource "means resources such as plants, aquatic life and wildlife, cultural, historic, recreational, geologic, and archeological sites, scenic areas, ecologically significant areas, watersheds, and minerals." HAR § 13-5-2 (1994).

The FEIS provides that construction and operation of the Solar Telescope would result in major, adverse impacts on cultural resources:

> Construction and operation of the proposed [Solar Telescope] at either the Preferred Mees or Reber Circle sites would result in major, adverse, short- and long-term, direct impacts on the traditional cultural resources within the [Region of Influence]. No indirect impacts are expected. Mitigation measures would be implemented; however, those measures would not reduce the impact intensity: impacts would remain major, adverse, long-term and direct.

The FEIS concluded that under the no-action alternative, "there would continue to be major, adverse, long-term, direct impacts to traditional cultural resources." The FEIS likewise concluded the cumulative impact to cultural resources of the Solar Telescope at the preferred and alternate site would be major, adverse, long-term, and direct. The Board found that while the impact on cultural resources was major, it was incremental and would exist even without construction of the Solar Telescope:

> 168.  Several people provided testimony as part of the [Supplemental] Cultural Assessment that conducting Native Hawaiian traditional cultural practices often requires an uninterrupted view of the summit area to make an emotional and physical connection to a place of importance.
>
> 169.  The presence of manmade structures on the summit already creates an interruption of the view.

15

The addition of the proposed [Solar Telescope] would only slightly increase the degradation of the summit as a traditional cultural property.

170. The FEIS determined that although the size and color of the [Solar Telescope] would have a major impact on native Hawaiians conducting traditional cultural practices, which often requires an uninterrupted view of the summit, because of the past construction of man made structures on the summit and the current view, which is already interrupted, the addition of the [Solar Telescope] would be incremental in degradation of the summit as a traditional cultural property. The addition of the [Solar Telescope] would result in readily detectable, localized effects, with consequences at the regional level to traditional cultural practitioners within greater Hawai'i. The cumulative effects on traditional cultural resources of past actions combined with the [Solar Telescope] would be major, adverse, long-term and direct.

171. The FEIS determined that although the No-Action Alternative would not contribute to changes in traditional cultural, historic, or archeological resources within the [Observatory Site], for those who believe that any man-made development in the summit area constitutes a form of desecration, those people would continue to find that the current development results in major, adverse, long-term, direct effects to traditional cultural resources.

The FEIS evaluated impacts to visual resources and viewplanes from within Haleakalā National Park and from populated areas of Maui, and determined impact intensity by comparing various existing views with images of views that included computer simulated images of the Solar Telescope.[10] Regarding the preferred Mees and alternative Reber Circle sites, the FEIS concluded that from within the Haleakalā National Park, "the prominence of the proposed new structure in views from within two miles of the [Solar Telescope] would result in moderate, adverse and long-term impacts to visual resources[,]" and "[n]o mitigation would adequately reduce this impact." The FEIS concluded that beyond Haleakalā National Park, "in views from throughout Maui . . . the proposed [Solar Telescope] would result in a minor, adverse and long-term impact to visual resources[,]"

_____

[10] The FEIS provided "[v]iewer sensitivity is assumed to be relatively high within the [Haleakalā National Park], based on the fact that viewers in the area are predominantly visitors to the national park with an expectation of high visual quality in the area."

and "[n]o mitigation would adequately reduce this impact."[11] Regarding the no action alternative, the FEIS concluded visual impacts were negligible, adverse, and long-term. The FEIS indicated the Solar Telescope's cumulative impact on visual resources and viewplanes, from both the preferred and alternate build sites, was major, adverse, and long-term. The Board found:

> 176. From within Haleakalā National Park, the prominence of the [Solar Telescope] at the Mees site, in views from within two miles of the [Solar Telescope] site . . . the proposed [Solar Telescope] would be visible to the point of co-dominance with other nearby structures. It would intensify the already developed appearance in its immediate surroundings, and would also appear to increase slightly the amount of horizontal space occupied by structures in views from within [Haleakalā National Park]. The new structure would not substantially alter the existing visual character visible in any view.
>
> . . . .
>
> 178. During the construction phase, however, crane equipment may be visible from outside [Haleakalā National Park].
>
> . . . .
>
> 182. From outside of [Haleakalā National Park], in views from throughout Maui (including windward, upcountry, central valley and south Maui locations), the proposed [Solar Telescope] at the Mees site would be visible atop distant ridgelines from a number of viewing locations and indistinguishable in views from other locations. Because of the distance of these views, regardless of whether the [Observatory Site] is presently visible from these locations, the proposed [Solar Telescope] would not substantially alter the visual quality of the views.

The FEIS concluded "there would be moderate, adverse, and long-term impacts on visitor use and experience from changes in the quality of recreational activities such as sightseeing, hiking, backpacking, photography, and camping associated with changes in the viewshed from construction activities at either the Preferred Mees site or the alternative Reber Circle site[.]" The FEIS concluded further that "[c]hanges in the viewshed during the operations phase would result in major, adverse, and

---

[11] The FEIS explained that "[b]ecause of the distance of these views, regardless of whether the [Observatory Site] is visible at present or not, the proposed [Solar Telescope] would not substantially alter the visual quality of the views."

long-term impacts on the visitor use and experience from locations where the proposed [Solar Telescope] would be prominently seen[.]" It also concluded that construction noise "would have a major, adverse, and short-term impact on visitor use and experience[,]" but this impact would be mitigated to "negligible, adverse, and long term between April 20th and July 15th; at other times of the year noise impacts would be mitigated to moderate, adverse and short-term." The FEIS indicated that for both the preferred and alternative build sites, cumulative impacts to visitor use and experience would continue to be major, adverse and long-term. The Board found:

> 190. Impacts on visitor use and experience would be anticipated if the proposed [Solar Telescope] were constructed. These impacts would result from changes in the quality of recreational activities such as sightseeing, hiking, backpacking, photography, and camping associated with changes in view from construction activity at the proposed [Solar Telescope] site and along the Park Road corridor.

> 191. Impacts on air quality associated with increased construction vehicle traffic and use would be minor, adverse, and short-term. These impacts would occur over the short-term, would be mitigated to the greatest possible extent, as set forth herein, and the impacts on visitor use and experience would diminish in the long-term.

> 192. Changes in the view would, however, continue to result in moderate and long- term impacts on the visitor use and experience from locations where the proposed [Solar Telescope] would be prominently seen.

Ultimately, the Board concluded the Solar Telescope would not substantially adversely impact existing natural resources because (1) specific measures had been proposed to mitigate impacts to cultural resources, view planes, and endangered flora and fauna, (2) ten other facilities already existed within the Observatory Site, which was specifically created for astronomy uses, (3) the "benefits to be derived from the [Solar Telescope] include not only the advancement of scientific knowledge that would be of significant benefit to the world, but it would also create economic benefits[,]" and (4) educational opportunities would be created for students and native Hawaiian astronomers.

After Kilakila appealed the Board's Order Granting CDUP, the circuit court concluded:

> 4. There exists substantial evidence that supports the conclusion that the [Solar Telescope] will not have a substantial adverse impact to existing natural resources with the surrounding area and community, consistent with [the Board's] decision, "when considered together with all minimization and mitigation commitments . . . [the Solar Telescope] will not cause substantial impact to existing natural resources with the surrounding area, community, or region."
>
> Although Kilakila cites to the [FEIS] in support of its arguments to the contrary, the Court agrees with [the University] that the FEIS is not necessarily a binding document. An environmental study is an "informational document" as outlined and explained in HRS § 343-2 and <u>Mauna Kea Power Co. Inc. v. Board of Land and Natural Resources [(Bd.)</u>, 76 Hawai'i] 259, 874 P.2d 1084 (1994).
>
> 5. [The Board's] decision that the [Solar Telescope] does not violate HAR Title 13, chapter 5, was not erroneous. The [Solar Telescope] would be in close proximity to other previously developed facilities for astronomy with the observation site. [The Solar Telescope]] would be "similar to the existing facilities at the . . . site and surrounding areas . . . will preserve the existing physical environmental aspects of the Land."

Kilakila contends the circuit court was wrong because substantial evidence does not exist to support the Board's conclusion that the Solar Telescope's adverse impact on natural resources would be less than substantial. Kilakila contends the Board failed to follow HAR § 13-5-30(c)(4) because:

(1) the FEIS and CDUA show the Solar Telescope's impacts on natural resources -- specifically cultural resources, visual view planes, natural beauty, and quiet -- would be substantial;

(2) the Board "offered no explanation for rejecting all this evidence";

(3) mitigation measures "do not reduce the impacts to less than substantial; and

(4) FOF 169 in the Board's Order Granting CDUP "distorts the evidence" and FOFs 167, 176 and 192 are clearly erroneous.

Kilakila's arguments regarding the evidence of substantial impacts to natural resources and the Board's failure to explain its alleged disregard of the same is unavailing. In

part, Kilakila's argument conflates the FEIS conclusion of a major impact on cultural resources with a substantial impact. The FEIS defines a "major" impact on cultural resources as an adverse impact where

> disturbance of a site(s) results in loss of integrity and impact(s) would alter resource conditions. There would be a block to, or great affect on, traditional access, site preservation, or the relationship between the resource and the affiliated group's body of practices and beliefs, to the extent that the survival of a group's practices and/or beliefs would be jeopardized.

The CDUA, however, appears to use the terms interchangeably:

> Within the FEIS, potential impacts were characterized with respect to intensities described as major, moderate, minor, and negligible. The criteria for the intensity of impact on each resource, the anticipated impacts on the natural environment, and mitigations for those impacts are described in [the FEIS]. Table I below is a summary of the resources, impacts, mitigations, and final impacts for the Mees Site (shown as Table 4-7 in FEIS Vol. I.) Table 2 below details the mitigations for those impacts (shown as Table 4-13 FEIS Vol. I.)
>
> Both Tables I and 2 below show that <u>the proposed [Solar Telescope] would have a substantial (major) adverse impact on cultural resources</u>. Specifically, the proposed [Solar Telescope] would be seen as culturally insensitive and disturb traditional cultural practices conducted within the [ROI, which includes parts of [Haleakalā National Park]. Noise and associated construction-related disturbances would also have a major, adverse impact on traditional cultural practices within the ROI. No mitigation would eliminate these impacts, but numerous mitigation measures would be employed to reduce such impacts as much as possible. As shown from the extensive analysis conducted during the EIS process, <u>no other aspects of the proposed land use would result in substantial (major) adverse impacts</u>.

(Emphases added.) The CDUA also provided the Solar Telescope "will cause a substantial visual impact on visitors to the summit area of [Haleakalā National Park] and only negligible impacts on populated parts of the greater Maui community." Nevertheless, whether an impact on natural resources is substantial and requires denial of a CDUP is within the Board's discretion. <u>See</u> HRS § 183C-3 (2011 Repl.); <u>see</u> <u>also</u> HAR §§ 13-5-1 (1994) and 13-5-30.

It is not the court's role here to weigh evidence. <u>See</u> <u>Application of Hawaiian Elec. Co., Inc</u>, 81 Hawai'i at 465, 918

20

P.2d at 567 ("[C]ourts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings[.]").  Assuming the FEIS concluded the impact on cultural resources was substantial, the Board is not bound by an applicant's EIS.  See Mauna Kea Power Co., Inc. v. Bd. of Land & Natural Res. (Bd.), 76 Hawaiʻi 259, 265, 874 P.2d 1084, 1090 (1994) (an EIS is an informational document whose acceptance is separate from the approval of a conservation district use application).  Similarly, it appears that the Board is not bound by the conclusions of a conservation district use application (otherwise, applicants could essentially dictate Board action).  "But where the record demonstrates considerable conflict or uncertainty in the evidence, the agency must articulate its factual analysis with reasonable clarity, giving some reason for discounting the evidence rejected."  In re Water Use Permit Applications, 94 Hawaiʻi 97, 163-64, 9 P.3d 409, 475-76 (2000) (**Waiāhole**).  To the extent the Board rejected the FEIS or CDUP conclusions regarding impacts to natural resources by concluding the Solar Telescope would not cause a substantial adverse impact, the Board's conclusion was consistent with Waiāhole.

Regarding impacts to the natural resources in question, the Board explained that it assessed the Solar Telescope within the "context of the [Observatory Site,]" as well as mitigation measures to be employed and conditions attached to the use permit.  The Board found the impact on cultural practices was incremental because the existence of other astronomy facilities already created an obstructed viewplane and as a result, the Solar Telescope would "only slightly increase the degradation of the summit as a traditional cultural property."  This is supported by the FEIS conclusion that the intensity of the impact on cultural resources would remain the same under the no-action alternative.  The Board applied a similar reasoning in its analysis of visual and noise impacts.  The Board also considered the several mitigation measures which included educational programs for native Hawaiians, minimizing noise from constructing

and operating the Solar Telescope at certain times, reserving Solar Telescope usage time for native Hawaiian astronomers, evaluating the exterior paint options periodically to make the Solar Telescope less noticeable,[12] and decommissioning and deconstructing the Solar Telescope within 50 years from the date operations begin upon consultation with native Hawaiian organizations. Consequently, the record shows the Board articulated its factual analysis with reasonable clarity and gave some reasons for discounting the alleged rejected evidence.[13]

Kilakila contends HAR § 13-5-30 "does not state that as long as mitigation measures are employed that substantial impacts magically become insubstantial." The Board concluded mitigation measures would reduce all impacts to natural resources to minimal, except for cultural and visual resources, but further concluded these resources would be adequately protected by measures taken beyond the mitigation proposed by the FEIS:

> c. The effect on, or impairment of, traditional cultural practices by the astronomical facilities currently located on the [Observatory Site] has, to a degree, already been mitigated by the construction and consecration of the east-facing ahu.[14] Protection of the native Hawaiian practitioners' exercise of cultural practices in the [Observatory Site] and near the [Solar Telescope] may be accomplished through the construction and consecration of a third ahu in a location to be agreed upon by [UIA] and Kilakila in consultation with the Cultural Specialist and the Native Hawaiian Working Group. The implementation of this measure together with the conditions contained in the Long Range Development Plan, Management Plan, Record of Decision and the Programmatic

---

[12] Additionally, the Board concluded "impacts to view planes will be mitigated through the choice of the location of the [Solar Telescope] within the [Observatory Site] and the periodic evaluation of exterior paint options that could make the [Solar Telescope] less noticeable." This would presumably apply to the Solar Telescope's impact to both visual resources and viewplanes, and visitor experience and use.

[13] Citing Application of Kauai Elec. Div. of Citizens Utilities Co., 60 Haw. 166, 184, 590 P.2d 524, 537 (1978) (**Citizens Utilities**), Kilakila contends the Board failed to identify evidence in the record to reach a conclusion different from the FEIS. This contention presumes the conclusions differ based on Kilakila's conflation of the terms "major," from the FEIS, and "substantial," from HAR § 13-5-1. Additionally, Citizens Utilities held the agency had a duty to provide findings to enable a meaningful review of its decision, see Citizens Utilities, 60 Haw. at 184, 590 P.2d at 537, which the Board here fulfilled.

[14] In Hawaiian, ahu is defined as a "heap, pile, collection, mound, mass; alter, shrine, cairn[.]" M.K. Pukui & S.H. Elbert, Hawaiian Dictionary at 8 (1986).

> Agreement . . . will reasonably protect the exercise of cultural practices in the [Observatory Site] and near the [Solar Telescope].
>
> . . . .
>
> 32.   The protection of the natural resources of the Haleakalā summit and the area covered by the application for the [CDUP] can be accomplished through implementation of the conditions contained in the Long Range Development Plan, Management Plan, Record of Decision, Programmatic Agreement, and the Habitat Conservation Plan and accompanying incidental take permits.

Additionally, throughout the Order Granting CDUP, the Board found and concluded the Solar Telescope's impact to cultural and visual resources was incremental, and the impact to those resources would exist without the development of the Solar Telescope.  We decline to assess whether the weight of evidence supports an administrative finding.  See Application of Hawaiian Elec. Co., Inc., 81 Hawai'i at 465, 918 P.2d at 567.

Kilakila also contends the Board failed to identify evidence that the mitigation measures actually reduced impact intensities, citing Makua v. Rumsfeld, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001) for the proposition that a "perfunctory description or mere listing of mitigation measures, without supporting analytical data, is insufficient to support a finding of no significant impact."  (Citation and internal quotation marks omitted.)  Rumsfeld is inapposite because it reviewed an agency's determination that an EIS was not required, a determination which was based "almost entirely" on mitigation measures whose effectiveness was not analyzed.[15]  Id. at 1217-18.  In contrast, here, an EIS was completed and we review the agency's grant of a CDUA.

Kilakila further contends the Board failed to follow HAR § 13-5-30(c)(4) because FOF 169 in the Board's Order Granting CDUP "distorts the evidence" and FOFs 167, 176 and 192 are clearly erroneous.

Kilakila contends FOF 169 "distorts the evidence" because it contradicts FOF 170 and misquotes the FEIS.  FOFs 169

---

[15]   . In some cases the law allows agencies to not complete an Environmental Impact Study (**EIS**) where the agency adopts mitigation measures. See Rumsfeld at 1217.

and 170 are not contradictory. FOF 169 provides the "presence of manmade structures on the summit already creates an interruption of the view. The addition of <u>the proposed [Solar Telescope]</u> <u>would only slightly increase the degradation</u> of the summit as a traditional cultural property." (Emphasis added.) FOF 170 provides:

> The FEIS determined that although the size and color of the [Solar Telescope] would have a major impact on native Hawaiians conducting traditional cultural practices, which often requires an uninterrupted view of the summit, because of the past construction of man[-]made structures on the summit and the current view, which is already interrupted, <u>the addition of the [Solar Telescope] would be incremental</u> <u>in degradation</u> of the summit as a traditional cultural property.

(Emphasis added.) The portion of the FEIS to which the Board cites in FOF 170 provides:

> Therefore, because of the past construction of man-made structures on the summit and the current view, which is already interrupted, <u>the addition of the [Solar Telescope]</u> <u>would be incremental in the degradation</u> of the summit as a traditional cultural property.

(Emphasis added.)

In light of the FEIS opinion, FOF 170 appears to mean the adverse impacts on cultural resources at the site were already major, direct, and long-term when the University submitted its CDUA, and the addition of the Solar Telescope would only increase the existing impact incrementally, resulting in a cumulative adverse impact of no greater intensity than what already existed. FOF 169 does not distort the evidence because under the circumstances, a "slight increase" and "incremental addition" are synonymous.

Kilakila contends FOF 167 was clearly erroneous because the record was replete with evidence that native Hawaiian usage of the summit prior to November 25, 1892 was established as a practice, and FOF 167 was contradicted by FOFs 3, 156, and 165.[16] [17] FOF 167 states "Kilakila did not provide evidence

---

[16]    FOFs 3, 156, and 165 provide:

>        3. [Kilakila] is an organization that is dedicated to the protection of the sacredness of the summit of Haleakalā. One of Kilakila's objectives is the protection of traditional and customary practices as well as natural

of any native Hawaiian usage of the summit of Haleakalā or the [Observatory Site] that was established in practice prior to November 25, 1892." FOF 167 relates to COL 29(a), the Board's conclusion that Kilakila failed to show that its directors or members engaged in traditional and customary activities, i.e., activities protected under Hawai'i law, according to Pratt.[18] The

---

> resources. The directors of [Kilakila] state that they engage in traditional and customary practices on Haleakalā. Among the practices exercised by the directors of [Kilakila] are: mālama āina [(taking care·of the land)], the burying of piko [(umbilical cord)], offering ho'okupu [(ceremonial gift-giving as a sign of honor and respect)] (including pule [(prayers, blessings)], oli [(chants)] and materials), connecting with their ancestors and participating in religious ceremonies. The directors of Kilakila enjoy views of and from the summit of Haleakalā and the beauty of the area.

(Record references omitted.)

> 156. Comments were received that the summit of Haleakalā was used by native Hawaiians both as a place of burials of the dead as well as a place for the burying of piko (umbilical cord). Burial places of the dead at Haleakalā include Makaopalena, Kealaohia, Puukilea, Hamohamo, Alalakeiki, and Niuaiaawa.

> . . . .

> 165. Members of Kilakila testified that they go to Haleakalā, especially during significant times such as the solstices and equinoxes, to welcome the sun. In particular, [a member of Kilakila] testified that she believed the cultural practice of going to the summit during these significant times started prior to 1892, although she could not say for sure. In addition, [this member] testified that she goes to the summit, to the parking area of the National Park Service, to conduct these practices.

(Record references omitted.)

[17] Hawaiian words as defined in M.K. Pukui & S.H. Elbert, Hawaiian Dictionary (1986).

[18] COL 29(a) provides:

> Although Kilakila has not shown that its directors or members engage in activities that are traditional and customary, according to Pratt, the Cultural Resources Assessment and the Supp. Cultural Assessment conducted in connection with the [Solar Telescope] have established that traditional cultural practices, such as religious prayer and ceremonies, the burying of piko [(umbilical cord)], and connection with akua (gods) and ancestors, have occurred and continue to occur in the summit area. The practices engaged in by the directors and members of Kilakila are consistent with the cultural practices set forth in the cultural assessments and will be accepted as such.

Board apparently discredited the evidence presented by Kilakila on this point, which was within the Board's discretion to do. See Application of Hawaiian Elec. Co., Inc., 81 Hawai'i at 465, 918 P.2d at 567. And considering Kilakila was found to have standing, they have not explained how an error on this matter affects its substantial rights. Hawai'i Rules of Civil Procedure Rule 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

Kilakila contends FOFs 176 and 192 accurately quote the FEIS but "to the extent they may imply that the visual impact is not substantial, they create an inaccurate impression." Again, contrary to Kilakila's assertions, the FEIS did not conclude the impact on visual resources and view planes was substantial, nor did the FEIS conclude the visual impact as it relates to visitor use and experience was substantial.

FOF 176 concerns the impact to visual resources and view planes and provides in part: "[The Solar Telescope] would intensify the already developed appearance in its immediate surroundings, and would also appear to increase slightly the amount of horizontal space occupied by structures in views from within the Park. The new structure would not substantially alter the existing visual character visible in any view." This is identical to language in the FEIS. Additionally, the CDUA provided that while the Solar Telescope would intensify the appearance of development from various views, it would be consistent with the scale and character of the existing views of the Observatory Site. As such, FOF 176 is not clearly erroneous. See Bremer v. Weeks, 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (An FOF is clearly "erroneous when the record lacks substantial evidence to support the finding.").

FOF 192 concerns the impact to visitor experience and provides: "Changes in the view would, however, continue to result in moderate and long-term impacts on the visitor use and

26

experience from locations where the proposed [Solar Telescope] would be prominently seen." The evidence regarding whether the Solar Telescope's individual impact to views is major or moderate, as it relates to visitor use and experience, is somewhat conflicting.[19] However, the Board appears to have weighted the existing impacts to views heavier than the additional impact caused by the Solar Telescope when it concluded the Solar Telescope's added impact, in context, would be slight. This is consistent with the FEIS, which provided the "existing visual impact of [the Observatory Site] could, however, still be considered to be contrary to visitor expectations for the summit area, with respect to the natural landscape vistas, and, with selection of the No-Action alternative, would continue to have a major, adverse, and long-term, direct impact on the viewshed." As such, FOF 192 is not clearly erroneous. See Bremer, 104 Hawai'i at 51, 85 P.3d 158 (An FOF is clearly "erroneous when the record lacks substantial evidence to support the finding."); see also Application of Hawaiian Elec. Co., Inc., 81 Hawai'i at 465, 918 P.2d at 567 (Courts refrain from determining whether the weight of evidence supports an administrative finding).

Kilakila also appears to contend FOFs 176 and 192 are clearly erroneous because they rely on an allegedly faulty visual impact analysis in the FEIS. The FEIS concluded that for both the preferred and alternative build sites, the Solar Telescope's impact on visual resource and view planes from within Haleakalā

---

[19] The FEIS indicated the Solar Telescope's individual impact on visitor experience would be overall moderate, adverse and long-term and that "[c]hanges in the viewshed during the operations phase would result in major, adverse, and long-term impacts on the visitor use and experience from locations where the proposed [Solar Telescope] would be prominently seen, as described in Section 4.5-Visual Resources and View Planes." Emphases added.) Section 4.5 assesses the direct and indirect individual impact to visual resources and concluded the intensity of impacts from various vantage points would not exceed moderate.

After receiving comments on the FEIS, the [National Science Foundation (**NSF**)], in its "Record of Decision," which approved the NSF's funding of the Solar Telescope, acknowledged that "in consideration of both the quantitative and qualitative analyses and the comments of the [National Park Service] and others, NSF agrees that the construction and operation of the [Solar Telescope] will have major adverse short-term and long-term impacts to visual resources and view planes within key areas of the Park that will thus result in major adverse impacts to the visitor experience within the Park." (Emphasis added.)

National Park would be moderate and that "[n]o mitigation would adequately reduce this impact." However, the FEIS defined moderate impacts as those in which mitigation measures "would likely be successful." While this inconsistency may cast doubt on the FEIS's impact assessment methodology, the Board appears to have not limited its analysis to the mitigation measures proposed by the FEIS as it concluded the "protection of the natural resources of the Haleakalā summit and the area covered by the application for the [CDUP] can be accomplished through implementation of the conditions contained in the Long Range Development Plan, Management Plan, Record of Decision, Programmatic Agreement, and the Habitat Conservation Plan and accompanying incidental take permits." Again, as discussed above, the Board is not bound by the EIS and we do not weigh the evidence.[20]

Kilakila contends FOFs 176 and 192 are clearly erroneous and cites State v. Diamond Motors, Inc., 50 Haw. 33, 36, 429 P.2d 825, 828 (1967) for the proposition that the Hawai'i Supreme Court held that protecting an industrial district from further encroachment was important, and even though structures already existed at a site, adding one that would rise fifty feet above any other structure would "substantially impair the view." Diamond Motors assessed the constitutionality of an ordinance regulating the size of outdoor signs and is inapposite. Diamond Motors, 50 Haw. at 33-35, 429 P.2d at 826-27. Kilkila cites to the supreme court's statement, "We accept beauty as a proper community objective, attainable through the use of the police power." Id. at 36, 429 P.2d at 827. That dicta does not support Kilakila's proposition.

### 4. HAR § 13-5-30(c)(5)

HAR § 13-5-30(c)(5) provides that "[t]he proposed land use, including buildings, structures, and facilities, shall be

---

[20] Additionally, Kilakila contends the University inadequately presented and defended the FEIS impact assessment methodology. This also goes to the weight of the evidence -- i.e., Kilakila suggests that the Board should not have credited the FEIS's assessments. Further, Kilakila fails to provide any authority to support its contention that the University had to explain or defend the methodology or that any other methodology should have been used.

compatible with the locality and surrounding areas, appropriate
to the physical conditions and capabilities of the specific
parcel or parcels[.]" Kilakila contends there is no evidence the
Solar Telescope would be compatible with Haleakalā National Park,
"which is only a few hundred yards away." Kilakila contends the
evidence supports the opposite conclusion and cites (1) the FEIS
conclusion that the cumulative impact on visitor use and
experience would be major, adverse, and long-term, (2) the NSF's
conclusion that the Solar Telescope, if located at the preferred
Mees site, would have a major, adverse, and long-term impact on
visual resources for Haleakalā National Park Visitors, and (3)
the National Park Service's (**NPS**) opinion, from the public
comments to the supplemental draft EIS, that

> The statement -- 'The proposed [Solar Telescope] would not
> hinder [Haleakalā National Park's] purpose . . . or prevent
> the NPS from continuing its conservation work to meet its
> guiding mission of preservation' should be deleted. Based
> on analysis the proposed action would not only hinder the
> NPS, but would prohibit our ability to conserve the scenery
> and other resources leaving them unimpaired for the
> enjoyment of future generations.

Kilakila's contention is unavailing. An "agency's
interpretation of its own rules is generally entitled to
deference[,]" unless the interpretation is plainly erroneous or
inconsistent with the underlying legislative purpose. Kaleikini
v. Yoshioka, 128 Hawai'i 53, 67, 283 P.3d 60, 74 (2012),
reconsideration denied, 128 Hawai'i 199, 285 P.3d 1013 (2012).
Here, the Board appears to have interpreted "locality and
surrounding areas" as immediate vicinity, i.e., the Observatory
Site:

> The [Observatory Site] was specifically set aside for
> observatory site purposes under Executive Order No. 1987.
> Astronomical and observatory facilities have existed on the
> [Observatory Site] since 1951. The [Solar Telescope]
> includes the construction of astronomical facilities which
> are compatible with the locality and surrounding areas,
> appropriate to the physical conditions and capabilities of
> the specific parcel.

Additionally, as discussed above, the Board's analysis under HAR
§ 15-5-30(c)(4) concluded the Solar Telescope would not cause a
substantial adverse impact to the existing natural resources

29

within the surrounding area, community or region.[21] Consequently, the record reflects compliance with HAR § 13-5-30(c)(5). See generally Application of Hawaiian Elec. Co., Inc., 81 Hawai'i at 465, 918 P.2d at 567 (Courts refrain from determining whether the weight of evidence supports an administrative finding).

### 5. HAR § 13-5-30(c)(6)

HAR § 13-5-30(c)(6) provides the "existing physical and environmental aspects of the land, such as natural beauty and open space characteristics, will be preserved or improved upon, whichever is applicable[.]" In COL 28(f), the Board concluded:

> The [Observatory Site] currently contains various astronomy facilities, including support buildings, roads, and parking lots. The [Solar Telescope] will not enhance the natural beauty or open space characteristics of the [Observatory Site]. However, because the proposed [Solar Telescope] is similar to the existing facilities at the [Observatory Site] and surrounding areas, the [Solar Telescope] will be consistent with and will preserve the existing physical and environmental aspects of the land.

Kilakila contends the University admitted the Solar Telescope did not improve natural beauty or open space characteristics and failed to demonstrate that the it preserves them. Kilakila asserts, "Given the negative visual impacts, it is not credible to claim that the [Solar Telescope] preserves natural beauty." This claim is without merit. HAR § 13-5-30(c)(6) concerns "existing physical and environmental aspects of the land" and is not limited to visual impacts. See HAR § 13-5-30(c)(6). And, we do not weigh the evidence to determine whether it supports an administrative finding. See Application of Hawaiian Elec. Co., Inc., 81 Hawai'i at 465, 918 P.2d at 567.

### 6. HAR § 13-5-30(c)(7)

HAR § 13-5-30(c)(7) provides, "Subdivision of land will not be utilized to increase the intensity of land uses in the conservation district[.]" Citing to HRS § 46-6(f)(6) (2012

---

[21] The plain language of HAR § 13-5-30(c)(4), prohibiting substantial adverse impacts to "existing natural resources within the surrounding area, community, or region[,]" appears broader than the geographic scope of HAR § 13-5-30(c)(5), which provides that the proposed land use "shall be compatible with the locality and surrounding areas, appropriate to the physical conditions and capabilities of the specific parcel or parcels[.]" (Emphases added.)

Repl.), Kilakila contends that by leasing land at the Observatory Site, the university is subdividing it, and that the Solar Telescope will increase the intensity of land use in the conservation district. HRS § 46-6(f)(6) defines "subdivision" as follows:

> **§46-6  Parks and playgrounds for subdivisions.**
>   . . . .
>
> (6)    "Subdivision" means the division of improved or unimproved land into two or more lots, parcels, sites, or other divisions of land and for the purpose, whether immediate or future, of sale, lease, rental, transfer of title to, or interest in, any or all such lots, parcels, sites, or division of land.  The term includes resubdivision, and when appropriate to the context, shall relate to the land subdivided. The term also includes a building or group of buildings, other than a hotel, containing or divided into three or more dwelling units or lodging units.

The Board concluded "[t]here is no proposed subdivision of land related to this application."  The record supports this conclusion.

## 7.   HAR § 13-5-30(c)(8)

HAR § 13-5-30(c)(8) provides, "The proposed land use will not be materially detrimental to the public health, safety, and welfare."  Kilakila contends "insofar as the [Solar Telescope] would adversely affect cultural resources, scenic views and Haleakalā National Park, it is detrimental to public welfare."  Kilakila provides no authority for this proposition.

The Board concluded the adverse impacts from the construction and operation of the Solar Telescope would not be materially detrimental to public health, safety and welfare, and the telescope would have broad benefits for the public health, safety and welfare:

> Adverse impacts from the construction and operation of the [Solar Telescope], including impacts to noise, air quality, water resources, and hazardous materials and solid waste, will be minimized or mitigated such that these impacts will not be materially detrimental to the public health, safety and welfare.
>
> Noise levels are required to be below levels required by the Department of Health and the construction personnel will be required to use appropriate safety procedures and equipment. Little impact is anticipated to air quality or

water resources. The use of best management practices during construction and the construction of a storm water collection system and replacement of an existing cesspool will mitigate against any potelltial impacts to water quality.

Little impact is anticipated from the solid waste or hazardous materials related to the [Solar Telescope]. Solid waste will be handled consistent with current procedures for the existing facilities which calls for solid waste to be kept in covered containers until it is removed to a licensed Maui landfill. Handling and storage of hazardous materials will be in compliance with the [Solar Telescope] Hazardous Materials and Hazardous Waste Management Program . . . . Aspects of the [Solar Telescope] have been redesigned to reduce or eliminate the need for the use or storage of hazardous materials.

The [Solar Telescope] is designed to protect public health, safety and welfare by providing scientific data that will assist in learning more about the Sun's effects on our atmosphere and environment and how the Sun affects communication, power transmission and presents hazards to humans in commercial air space.

The record reflects compliance with HAR § 13-5-30(c)(8).

**B. The Board did not err by considering economic factors.**

Kilakila contends the Board improperly considered economic benefits, job creation, and community benefits -- criteria not included in HAR § 13-5-30(c). This contention is without merit. The Board concluded, under its HAR § 13-5-30(c)(4) analysis, that

The benefits to be derived from the [Solar Telescope] include not only the advancement of scientific knowledge that would be of significant benefit to the world, but it would also create economic benefits. Jobs and revenue for the economy would be created on Maui, both in the construction of the [Solar Telescope] and in the continued operation of the [Solar Telescope]. Educational opportunities would be created for students at the Maui Community College as well as for native Hawaiian astronomers.

The circuit court found:

[The Board] acted consistently with HAR § 13-5-1 which states, "[t]he purpose of this chapter is to regulate land use in the Conservation District for the purpose of conserving, protecting, and preserving the important natural and cultural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety, and welfare." [The Board] did not commit error in considering other benefits.

Kilakila contends the Board's decision-making authority is "naturally constrained" by HAR Chapter 13-5 but provides no authority for the proposition that the Board is limited to

considering the HAR § 13-5-30(c) criteria when deciding whether to grant conservation district use permits. As the circuit court found, HAR § 13-5 has a broad purpose, and includes promoting the public health, safety, and welfare. Additionally, the Solar Telescope was subject to environmental review under HRS Chapter 343. HRS § 343-2 (2010 Repl.) defines an "environmental impact statement" as

> an informational document . . . which discloses the environmental effects of a proposed action, effects of a proposed action on the <u>economic welfare, social welfare, and cultural practices of the community and State, effects of the economic activities arising out of the proposed action</u>, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.

(Emphasis added.) And, HAR § 11-200-1 (1996) provides "Chapter 343, HRS, establishes a system of environmental review at the state and county levels which shall ensure that environmental concerns are given appropriate consideration in decision making <u>along with economic and technical considerations</u>." (Emphasis added.)

### C. The Board did not err erred by weighing the lack of alternatives against the Solar Telescope's adverse impacts.

Kilakila contends the Board's rules do not allow the Board "to disregard, or minimize the importance of, visual or other impacts simply because there may be no other place, or manner, that a particular project can be built." The Order Granting CDUP provided:

> 23. The visual or other impacts of a project are site specific. *In the Matter of Conservation District Use Application for Hawaiian Electric Company, Inc. to Construct a 138-kV Transmission Line at Waʻahila Ridge, Honolulu, Hawaiʻi*, DLNR File No. OA-2801 (*"Waʻahila Ridge Decision"*) at 65-66, fn. 17 (Ex. B-1.)
>
> 24. BLNR also takes into consideration whether limited alternatives may outweigh the obvious visual or other impacts. [<u>Id.</u>] at 66, fn. 17 . . . .
>
> 25. Whether alternative sites for the project necessarily are limited by their nature, obvious visual or other impacts may be outweighed. [<u>Id.</u>] . . . .
>
> 26. Structures and land uses which impact a public viewplane of a significant natural feature like a puʻu or ridge should propose adequate mitigation or make some showing of the lack of reasonable and practicable alternatives. [<u>Id.</u>] at 64, fn. 13.

The Board concluded "Haleakalā is one of only three possible locations for the [Solar Telescope] in the world. Of the three possible locations, Haleakalā is the best location. There are no alternative sites for the [Solar Telescope] in [Hawai'i]." In response to Kilakila's argument below that the Board erred by considering the lack of alternative sites as a basis for its decision to grant the CDUP, the circuit court concluded:

> 7. Kilakila cites the Court to HAR § 13-5-30(c) asserting that the rules "do not allow the [Board] to disregard, or minimize the importance of, visual or other impacts simply because there may be no other place, or manner, that a particular project can be built." However, the record reflects that the [Board] did consider other sites, including locations at the Reber Circle site and the lower Mees site.

(Record references omitted).

The circuit court appears to have misconstrued Kilakila's argument on this point. Kilakila contended the Board erred by considering whether a lack of alternative sites weighed in favor of granting the CDUP despite the Solar Telescope's impact on natural resources; Kilakila did not contend the Board failed to consider alternate sites. Nevertheless, Kilakila cites to no authority that the criteria set forth in § 13-5-30(c) is exhaustive or that the Board was limited to considering only § 13-5-30(c)'s criteria, and we find none.

### D. UIA was authorized to apply for the conservation district use permit.

Kilakila contends "[a]s a body corporate, only the University itself has the legal authority to apply for permits[,]" and that UIA had no authority to apply for a permit in its own name. Kilakila also contends HAR § 13-5-31(a)(5) (1994) requires the landowner to sign the conservation district use application and here, the landowner is the UH, not the UIA. Kilakila's contentions are unavailing.

HAR § 13-5-31(b) provides that for "state and public lands, the [State] or government entity with management control over the parcel shall sign as landowner." The Order Granting CDUP's FOF 2, unchallenged on appeal, provides:

> 2. The [UIA] was established in 1967 as an Organized Research Unit at the University of Hawaii at Manoa. [UIA]

conducts research and educational programs in most areas of modern astronomy; it develops and manages observatory facilities on Haleakalā and Mauna Kea; and it constructs state-of-the-art astronomical instrumentation.

Kilakila provides no authority to support the proposition that the UIA director could not sign for the University as "landowner."

E.   **The Solar Telescope is consistent with the Management Plan.**

Kilakila contends the Solar Telescope is inconsistent with the Management Plan because the staging and laydown area for the Solar Telescope is to be located outside the Observatory Site, at the adjacent Federal Aviation Administration (**FAA**) site, contrary to the Management Plan's prohibition against parking outside the Observatory Site.   This contention is unavailing. The Management Plan provides "to protect vital environmental resources . . . [p]arking of heavy equipment and storage of construction materials outside the immediate confines of [the Observatory Site] property is prohibited." (Emphasis added.)   The Draft Supplemental Environmental Assessment, to which Kilakila cites, provides the Solar Telescope staging and laydown area would be located on both the Observatory Site and FAA property. This assessment also provides that the FAA property to be used for parking was previously disturbed, so parking on it would not result in adverse effects on biological or archeological resources, nor would it increase "environmental impacts as compared to the FEIS analysis."   The circuit court concluded the Management Plan "intended to prohibit parking specifically in areas that contain vital environmental resources."   Kilakila does not contend the purported deviation from the Management Plan impacts vital environmental resources nor does the record reflect such.

F.   **The Board's approval of Permit MA-11-04 did not violate Kilakila's due process rights.**

Kilakila contends the Board prejudged the contested case hearing.   The thrust of Kilakila's contention is that by first approving Permit MA-3542 without holding a contested case

hearing, the contested case hearing that resulted in the approval of Permit MA-11-04 was a mere formality, violating Kilakila's due process rights.

As evidence, Kilakila asserts the Board did not allow Kilakila to present its full case before it approved Permit MA-3542 in 2010. However, Kilakila 1 "involve[d] appellate review of the December 1, 2010 decision by [the Board] to grant the conservation district use application . . . filed by [the University]." Kilakila 1, 131 Hawai'i at 206, 317 P.3d at 40. Kilakila's due process argument relating to the Board's voting prior to holding a contested case was addressed by Kilakila 1. Conversely, the instant case involves appellate review of the Board's November 9, 2012 decision granting Permit MA-11-04. Kilakila does not contend it was prohibited from presenting evidence at the contested case hearing subject to review here.[22]

Kilakila also contends the Board's prejudgment is evidenced by authorization of construction before the 2012 contested case hearing had concluded. This contention is unavailing. Kilakila appears to be referring to Minute Order No. 19, which provided:

> On April 11, 2012, the Board received notice that [UIA] intended to commence construction activity on Monday, May 14, 2012. By a separate letter [UIA] indicated that the construction activity would include 1) the removal of Reber Circle and other previously disturbed sites and 2) the creation of power and communications corridors to Pan-STARRS and Mees buildings.
>
> The Board is concerned that [UIA] intends to initiate construction activity while the contested case hearing for CDUP MA-3542 is ongoing. Despite this concern, the Board recognizes that the removal of Reber Circle and other previously disturbed sites, as described in Exhibit A, has long been supported by Kilakila's president, Ki'ope Raymond.
>
> With the concurrence of four members, the Board approves modification of CDUP MA-3542 to include the following condition no. 19:
>
> > 19. No construction shall occur during the pendency of the contested case proceeding before the [Board], DLNR File No. MA-11-04, except for the removal of Reber Circle Site # 50-50-11-5443 and

___

[22] Kilakila's Proposed Findings of Fact, Conclusions of Law, Decision and Order confirms this, providing: "All the declarations, testimony and exhibits submitted by [Kilakila] were received into evidence except that Exhibit B-5 was redacted to exclude page 4-67."

> removal of unused facilities at the [Observatory Site], as required by sections II.G. and II.H. of the Programmatic Agreement among the [NSF], the [NPS], the [University], the State Historic Preservation Officer, and the Advisory Council on Historic Preservation. Removal of Reber Circle shall be in accordance with the requirements set forth in the Programmatic Agreement.

Per the Order Granting CDUP's FOFs 282 and 283, the Reber circle site is a remnant of a former telescope facility at the Observatory Site, the removal of which was required both by the Programmatic Agreement as a mitigation measure for the Solar Telescope, and significantly, an Archaeological Recovery Plan that was Board approved in 2006. Kilakila has not contested FOFs 282 or 283 on appeal.

### G. The Board's procedure was authorized.

Kilakila contends "[n]o law allowed the [Board] to conduct a contested case on whether to grant a conservation district use permit when it had already granted the permit." As the concurrence in Kilakila 1 states, the HAR does not explicitly authorize the Board, after holding a contested case hearing, to revoke a permit it granted before holding the hearing. See Kilakila 1, 131 Hawai'i at 213, 317 P.3d at 47. However, as discussed above, construction appears to not have commenced under the first permit, Permit MA-3542. And, the Board has broad powers under HRS § 171-6 (2011 Repl.), including the power to "[d]o any and all things necessary to carry out its purposes and exercise the powers granted in [HRS Chapter 171]." HRS § 171-6(20). Consequently, the contested case hearing that ultimately led to approval of the second permit, Permit MA-11-04, was authorized.

Kilakila also contends the contested case hearing was procedurally flawed because it was "riddled with procedural irregularities, including political pressure, ex parte communication, the dual role of a deputy attorney general, and the arbitrary omission of key findings of the hearing officer." Citing Waiāhole, Kilakila contends political pressure -- purportedly from Senator Inouye's office pressuring the Haleakalā National Park superintendent to mute objections to the Solar

37

Telescope, and Senator Inouye and Governor Abercrombie's respective offices pressuring Jacobson to recommend approving the CDUA -- violated its procedural due process rights.  This contention is without merit.

HAR § 13-1-37 provides:

§13-1-37 Ex parte (single party) communications.

(a) No party or person petitioning to be a party in a contested case, nor the party's [sic] or such person's [sic] to a proceeding before the [Board] nor their employees, representatives or agents shall make an unauthorized ex parte communication either oral or written concerning the contested case to the presiding officer or any member of the [Board] who will be a participant in the decision-making process.

(b) The following classes of ex parte communications are permitted:

(1) Those which relate solely to matters which a board member is authorized by the [Board] to dispose of on [sic] ex parte basis.

(2) Requests for information with respect to the procedural status of a proceeding.

(3) Those which all parties to the proceeding agree or which the board has formally ruled may be made on an ex parte basis.

The Board discharged Jacobson on March 29, 2012 after he sent an impermissible ex parte communication to counsel for the University regarding alleged pressure placed upon him to render a decision.  The Board found the totality of the circumstances gave rise to a question regarding Jacobson's impartiality.  The Board struck Jacobson's filings and appointed a new hearings officer, Ishida.  Kilakila does not contend Ishida was subject to any ex parte communication or political pressure.  Consequently, any impropriety was cured when the Board discharged Jacobson and appointed Ishida.  See generally Waiāhole (concern regarding adjudicator impartiality focuses on the relation between the communications and the decision-making process).

Kilakila contends the Board erred by refusing to disqualify Chow as counsel for the tribunal because she had a conflict of interest, having represented the Board in circuit court proceedings regarding Kilakila's challenge of the first permit, Permit MA-3542.  Kilakila's citation to White, 54 Haw. at

16, 501 P.2d at 363 is unavailing. <u>White</u> involved a deputy attorney general who represented a party, a superintendent, in an adversarial hearing against a teacher, and then represented the tribunal in related hearings before the Board of Education. <u>Id</u> at 11-12, 501 P.2d at 360-61. Here, Chow did not represent a party and has only represented the Board.

### IV. CONCLUSION

Accordingly, the "Final Judgment" entered August 20, 2013, and the "Order Affirming the Board of Land and Natural Resources' Findings of Fact, Conclusions of Law, Decision and Order in DLNR File No. MA-11-04" entered July 11, 2013, both entered in the Circuit Court of the First Circuit are affirmed.

DATED: Honolulu, Hawaiʻi, October 17, 2014.

On the briefs:

David Kimo Frankel
Sharla Ann Manley
(Native Hawaiian Legal
Corporation) for
Appellant-Appellant Kilakila ʻO
Haleakalā.

Presiding Judge

Darolyn H. Lendio,
University General Counsel,
Bruce Y. Matsui
(Office of the General Counsel)
and
Lisa Woods Munger
Lisa A. Bail
Adam K. Robinson
(Goodsill Anderson Quinn &
Stifel) for
Appellee-Appellee University of
Hawaiʻi.

Associate Judge

Acting Associate Judge

William J. Wynhoff
Linda L.W. Chow
Deputy Attorneys General for
Appellee-Appellee
Board of Land and Natural
Resources, William Aila, in his
capacity as the Chairperson of
the Board of Land and Natural
Resources; and Department of
Land and Natural Resources.